FILED
2020 Oct-08  PM 12:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **PHILLIP BONE,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.:  5:18-cv-01706-LCB** |
| | ) |
| **ALLIANCE INVESTMENT** | ) |
| **COMPANY, LLC D/B/A AIC** | ) |
| **CONCRETE** | ) |
| | ) |
| **Defendant.** | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination case is before the Court on the Defendant's Motion for Summary Judgment on Plaintiffs Phillip Bone, Quintin Davis and Jeffrey Garner's claims of discrimination and retaliation under Title VII and § 1981 while employed by Defendant.  (Doc. 22).  The motion has been fully briefed and is ripe for review.  For the reasons that follow, the Court finds that the Defendant's Motion for Summary Judgment is due to be denied in part and granted in part.

### I.  Factual Background

Phillip Bone, Quintin Davis and Jeffrey Garner sued their former employer, Alliance Investment Company, LLC (AIC") for hostile work environment and retaliation. (Doc. 1). The Plaintiffs are all African American males, and allege that

the Defendant discriminated against them because of their race. (Doc. 1, p. 3). Plaintiff Bone began working as a carpenter at AIC in March of 2017 while Plaintiff Davis and Plaintiff Garner began working as carpenters at AIC in April of 2017. (Doc. 1, p. 3). All three Plaintiffs were assigned to work on the NASA jobsite. (Doc. 22-2, p. 3). Daniel Gibson was the Vice President of AIC and was responsible for day-to-day operations at all relevant times. (*Id.* at 2). Alvin Gibson was the General Superintendent of the commercial division and reported to Daniel Gibson. (*Id.*). Howard Damen was the foreman on the NASA jobsite until May 18, 2017, when he resigned from the company. (*Id.* at 4). Following his resignation, beginning on May 18, 2017, Plaintiffs were supervised by Markus Pollitz who is a white male. (Doc. 22-3, p. 2).

On May 24, 2017, Bone confronted Pollitz about allegations that he had called them "nigger." (Doc. 22-1, p. 4). On May 25, 2017, the Plaintiffs went to Defendant's office to show Daniel Gibson a video of Brandon Kent, another employee working on the NASA project, stating that Pollitz was calling them "niggers." (*Id.*). Prior to going to Defendant's Office, Bone told Alvin Gibson about the use of racial slurs, and Gibson responded that "I don't believe you." (Doc. 26, p. 5). Plaintiffs were told by coworkers that Pollitz was using the slur to refer to Plaintiffs "up and down the building and to the coworkers, too." (Doc. 22-5, p. 11). Tyler Marshall also told Plaintiff Davis that Pollitz told the Caucasian workers they

should stop working so hard and "[l]et those niggers do the work." (Doc. 22-7, p.

13). Plaintiffs also contend that they were left with more difficult, physical tasks at

the job site than their white counterparts, and white coworkers stated that this was

the case. (Doc. 22-7, p. 14).

Besides the second-hand statements of racial slurs, Plaintiffs also had direct

instances of hearing racial slurs. During his time on the NASA site, Davis overheard

Pollitz say "You're just like the rest of them [slur]." (Doc. 22-7, p. 15). Bone also

overheard Pollitz say the slur while talking to another person on the jobsite. (Doc.

22-11, p. 14). However, Garner is the only plaintiff that alleges he was called the

slur by Pollitz directly. (Doc. 22-1, p. 13).

Plaintiffs contend that when they tried to show Daniel Gibson the video, he

was initially not interested in watching it. (*Id.* at 8). Garner states he was terminated

before he could show Gibson the video. (*Id.* at 4). However, Gibson contends that

he wanted a copy of the video to investigate the allegation, but Plaintiffs refused to

provide a copy of the video. (Doc. 22-1, p. 4). Plaintiffs state that Gibson did not

want a copy but instead the original video which was in possession of Garner. (Doc.

26, p. 4). Plaintiffs contend they were told that they were being terminated, and

Gibson offered them their paychecks in exchange for possession of the video

recordings. (*Id.* at 5). Garner and Davis stated that they received their paychecks on

May 25, 2017, while Bone claimed he did not receive his last check for working on

the NASA project. (*Id.*). However, Defendant contends that Plaintiffs demanded their final checks from Gibson and stated they did not want to work for Defendant any longer. (Doc. 22-1, 5). According to Defendant, on May 26, 2017, Gibson issued Plaintiffs their checks early and called them to pick up their checks. (Doc. 22-1, pp. 6-7).

On May 26, 2017, Daniel Gibson and another employee found tourniquets on the ground where the Plaintiffs had been standing and where their cars were parked. (Doc. 22-1, p. 7). On May 30, 2017, Alvin Gibson allegedly called five employees including Bone, Garner, Davis, Bryan Irwin (Caucasian), and Tyler Marshall (Caucasian) to report for a drug screen. (Doc. 26, p. 7; 22-7, p. 22). Defendant contends Plaintiffs did not report for their drug screening test on May 30, 2017, and Plaintiff Garner and Plaintiff Davis admit that employees are subject to drug screens upon the company's request. (Doc. 22-1, p. 7). Alvin Gibson testified that the AIC Drug and Alcohol Policy states that "if an employee fails to furnish the appropriate samples 'when requested' they are subject to immediate termination." (Doc. 22-3, p. 3). Garner contends that he took the test on May 30, 2017, as requested. (Doc. 22-5, p. 60). Davis admits that he took the drug test on May 31, 2017. (Doc. 22-6, p. 4). However, Defendants dispute that Garner took the drug test on May 30, 2017, and the Drug Screen Test Results have May 31, 2017, as the sample collection date for Garner's drug test. (Doc. 22-5, p. 72).

On May 31, 2017, Alvin Gibson texted all Plaintiffs requesting they turn in their badges for failing to take the drug test on May 30, 2017. (Doc. 22-3, p. 4; Doc. 22-9, p. 3; Doc. 22-10, p. 3). Garner and Davis contend they were already terminated prior to Alvin Gibson's texts. (Doc. 22-5, p. 13).  Plaintiff Bone contends that he went to take the drug screen at the testing facility and that he was not in the facility's system. (Doc. 22-11, p. 19). Plaintiff Bone then called Alvin Gibson for instructions on taking the test and Gibson told him, "Don't worry about that. I'll call you when we got a job." (*Id.*).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that

5

there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

6

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Discussion

Defendant moves for summary judgment against Plaintiffs on the following grounds. First, Defendant argues that Plaintiffs' hostile work environment claims fail as a matter of law because Plaintiffs failed to present substantial evidence that the harassing racial conduct was sufficiently severe or pervasive to alter the terms or

conditions of their employment. (Doc. 22-1, p. 11). Second, Defendant argues that Plaintiffs' retaliation claims fail as a matter of law because Plaintiff Bone was not terminated, and there is no evidence Plaintiffs were treated less favorably than similarly situated individuals outside of their protected class. (Doc. 22-1, pp. 19-20). Further, Defendants contend that Plaintiffs were terminated for failure to take a drug test, not in retaliation for reporting racist remarks. (Doc. 22-1, pp. 20-22). The Court will take the two arguments in turn.

## A. Hostile Work Environment Claim

Plaintiffs bring this lawsuit pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). (Doc. 1, p. 1). Under Title VII, an employer cannot discriminate against an individual on the basis race or color. 42 U.S.C. § 2000e-2(1) ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, [or] color."). Section 1981 similarly states, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. The Eleventh Circuit is clear that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (*quoting Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998)). Therefore, the Court will combine the Title VII and § 1981 analyses into one.

To establish a hostile work environment claim under Title VII, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). In hostile work environment cases where the harassment is based on race, a plaintiff must prove

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)).

Summary judgment is due "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Therefore, the question arises whether the non-movant's version of the facts shows that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."[1] See *Miller*, 277 F.3d at 1275.

### 1.  Severe and Pervasive Racial Harassment

Defendant contends in its motion that Plaintiffs failed to present substantial evidence that the harassing conduct was sufficiently severe or pervasive to alter the terms or conditions of his employment. The Court agrees. The Defendant argues in support of this contention that Plaintiffs were not personally subjected to severe and pervasive harassment. (Doc. 22-1, p. 12). This argument relies on the fact that (1) Plaintiffs could only point to isolated utterances of the slur, (2) second-hand comments did not create a hostile work environment, and (3) the totality of the circumstances was insufficient to show a hostile work environment. (Doc. 22-1, pp. 12-18).

---

[1] Defendant did not dispute that Plaintiffs, who are African American, are all members of a protected group and did not make any arguments regarding the other hostile work environment elements. (Doc. 22-1, p. 12).

"To establish that harassing conduct was severe or pervasive, an employee must meet both a subjective and objective test." *Barrow v. Georgia Pac. Corp.*, 144 F. App'x 54, 56 (11th Cir. 2005) (citing *Mendoza*, 195 F.3d at 1246); *see also Dugandzic v. Nike, Inc.*, 807 F. App'x 971, 975 (11th Cir. 2020) (*citing Miller*, 277 F.3d at 1276 ("To be actionable, behavior must result in 'both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives ... to be abusive.'")). The Court will first answer the question of whether Plaintiffs established that there was a subjective belief that Pollitz's conduct was abusive.

Plaintiffs first approached Pollitz to address whether he used a slur in reference to them. (Doc. 22-11, p. 16). It is undisputed that Plaintiffs then approached management by going to Daniel Gibson's office to report the abusive conduct. (Doc. 22-2, p. 3; Doc. 22-3, p. 2). Pollitz's behavior bothered Plaintiffs enough that they approached both Pollitz and Daniel Gibson to address the behavior that is now the basis of their discrimination suit. This evidence, when viewed in the light most favorable to the Plaintiffs, establishes that Plaintiffs found the behavior subjectively abusive. The Court will now determine if the harassment was objectively abusive.

"In evaluating the objective severity of the harassment, [the Court should] consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a

11

mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997); *Harris*, 510 U.S. at 23). The objective severity of the behavior is determined by the totality of the circumstances. *Mendoza*, 195 F.3d at 1246 (internal citations omitted)("The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

"Any relevant factor must be taken into account, but no single factor is dispositive." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) (citing *Harris*, 510 U.S. at 23). Plaintiffs argue that there is evidence of at least three of these factors including "frequency, offensive utterances, and whether the behavior interferes or alters the employees work performance." (Doc. 26, p. 12). There was no contention by Plaintiffs or evidence on the record that any of the conduct was physically threatening or humiliating; therefore, the Court will look to the other objective severity factors and will analyze the factors for each Plaintiff in turn. *See Williams v. Ruskin Co., Reliable Div.*, No. 1:10-CV-508-WC, 2012 WL 692964, at *13 (M.D. Ala. Mar. 1, 2012) ("Because each of the Plaintiffs must individually

make out a *prima facie* case, the court analyzes each Plaintiff's individual hostile work environment claim.").

### a. Jefferey Garner

The evidence of racial harassment relies in part on the racial slur that was said to Garner. Garner testified that he was called "nigger" directly by Pollitz. There is also evidence on the record that Plaintiffs were called racial slurs outside of their presence. Garner testified that he was told that Pollitz was using the slur to refer to Plaintiffs "up and down the building and to the coworkers, too." (Doc. 22-5, p. 11). Caucasian workers were told by Pollitz that the Caucasian workers should stop working so hard and "[l]et those niggers do the work." (Doc. 22-7, p. 13). Plaintiffs also contend they were left with more difficult, physical tasks at the job site than their white counterparts, and white coworkers stated that this was the case. (Doc. 22-7, p. 14). To the frequency factor, the alleged harassing conduct occurred over the course of six days. In these six days, there was only one occasion that Garner heard the slur. However, there is no evidence in the record of how and when these other statements were allegedly made. Therefore, the frequency factor is due little weight.

Next, the offensive utterance of the slur is severe. See *Adams v. Austal*, *U.S.A., L.L.C.*, 754 F.3d 1240, 1255 (11th Cir. 2014) (noting "the use of the slur 'nigger' is severe"). While the use of that term is both reprehensible and offensive, the conduct

in this case does not rise to the level set out by the Eleventh Circuit on what constitutes an objectively hostile work environment. See *Barrow v. Georgia Pac. Corp.*, 144 F. App'x 54, 58 (11th Cir. 2005) (finding some Plaintiffs' evidence of the n-word being used sporadically in conjunction with Confederate flags and KKK symbols being displayed at work "did not meet the standard of severe and pervasive harassment"); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (finding that Plaintiff's workplace was not objectively hostile despite employees wearing Confederate flags on their clothing daily and racist graffiti in the bathroom along with Plaintiff hearing the n-word spoken a few times over two years, and learning about a noose in the bathroom).

Further, there is no evidence in the record that Pollitz's words or conduct impacted Garner's job performance. Therefore, under the totality of the circumstances, a reasonable jury would not find this workplace to be hostile. Garner has failed to point to specific factual evidence that would create a dispute as to whether his workplace was hostile. Consequently, summary judgment is appropriate.

### b. Quintin Davis

Quintin Davis worked with Pollitz for approximately six days. During this time, Davis overheard Pollitz say "You're just like the rest of them niggers." (Doc.

22-7, p. 15). Davis admits this was not said directly to him. (*Id.*). Although the frequency analysis of Davis is the same as Garner's analysis, the racial slur was not said directly to Davis which impacts the analysis. In *Adams v. Austal, U.S.A., L.L.C.*, the Court found that a reasonable person would not find that his work environment was hostile while noting that "although the use of the slur 'nigger' is severe, it was not directed toward him or directly humiliating or threatening to him." 754 F.3d 1240, 1255 (11th Cir. 2014). The fact that slur was not directed at Davis decreases the severity level from the analysis used with Garner. There is no evidence on the record that Pollitz's words or conduct impacted Davis' job performance. Therefore, under the totality of the circumstances, a reasonable jury would not find Davis's workplace to be hostile. Like Garner, Davis has failed to identify facts in the record sufficient to create a dispute as to whether Defendant's behavior created a hostile work environment. Thus, summary judgment is appropriate as to this particular claim.

### c.  Phillip Bone

On or around May 23, 2017, Bone asserts that he heard Pollitz use the slur while talking to another individual off to the side. (Doc. 22-11, p. 14). Bone testified that he thought Pollitz was referring to him, but he was not sure. (*Id.*) The frequency factor analysis is the same as the one for Garner. However, the severity of the behavior in this instance is less than the severity of the behavior towards Garner

because the racial slur was not directed at Bone. See *Adams*, 754 F.3d at 1255. Therefore, as with Plaintiffs Garner and Davis, the totality of the circumstances would not lead a reasonable jury to find that Plaintiff Bone's workplace was objectively hostile, and summary judgment is due to granted as to this claim

## B. Retaliation Claim

The Defendant contends next in its Motion for Summary Judgment that Plaintiffs' retaliatory discharge claims fail as a matter of law because (1) there is no evidence that Bone was terminated, (2) there is no evidence that Plaintiffs were treated less favorably than a similarly situated individual outside of their protected class, and (3) Plaintiffs were terminated for failing to report to a drug test in violation of AIC policy. (Doc. 22-1, pp. 18-22).

Plaintiffs rely upon only circumstantial evidence to establish Defendant's retaliatory intent. The Eleventh Circuit relies upon the *McDonnell Douglas*[2] burden-shifting framework "[w]hen a Title VII retaliation claim . . .is based on circumstantial evidence." *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (*citing Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013)).

---

[2] 411 U.S. 792 (1973).

"To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show (1) that 'she engaged in statutorily protected activity,' (2) that 'she suffered an adverse action,' and (3) 'that the adverse action was causally related to the protected activity.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (*citing Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)). "Once the *prima facie* case is established, it creates a 'presumption that the adverse action was the product of an intent to retaliate.'" *Gogel*, 967 F.3d at 1135 (*quoting Bryant*, 575 F.3d at 1308). After a *prima facie* case of retaliation is established, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* (quoting *Bryant*, 575 F.3d at 1308).

Finally, "if the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant 'was not the real basis for the decision, but a pretext for discrimination.'" *Johnson*, 948 F.3d at 1325 (*quoting Richardson*, 71 F.3d at 806). As decided above, Plaintiffs failed to establish a *prima facie* case for a hostile work environment, so we now turn to whether Plaintiffs established a *prima facie* retaliation case.

### 1.  Prima Facie Case of Retaliation

### a. Statutorily Protected Activity

Defendant in its Motion does not challenge whether Plaintiffs engaged in statutorily protected activity when they reported racial discrimination to Daniel Gibson. Also, there is evidence that Plaintiffs reported that slurs were directed at them immediately after the incident took place. Further, the Eleventh Circuit has noted that "Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). Thus, the Court will assume that Plaintiffs were engaging in statutorily protected activity and will turn to whether an adverse employment action took place.

### b. Adverse Action

Defendant contends that Bone was not terminated but left the company for a higher paying position. (Doc. 22-1, p. 19). Plaintiffs did not challenge this contention in their Reply instead focusing on the fact that the actions of Plaintiffs were statutorily protected and causally related to the alleged termination. However, in their Complaint, all Plaintiffs alleged they were terminated because they complained of race and color discrimination. (Doc. 1, p. 6).

On May 31, 2017, all Plaintiffs were notified they were terminated for not reporting to take a drug test as allegedly requested by Defendant on May 30, 2017.[3] Since Defendant itself asserts it terminated all Plaintiffs, including Bone, there are facts in the record which, when viewed in the light most favorable to the Plaintiffs, demonstrate that Plaintiffs suffered an adverse employment action, i.e., termination (Doc. 22-1, p. 20).

### c. Causal Relation

Finally, the Court turns to whether there was a causal connection between the termination of the Plaintiffs and their action in reporting Pollitz's racial epithets. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (*citing Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798–99 (11th Cir. 2000)). However, "mere temporal proximity, without more, must be 'very close.'" *Id*. (*quoting Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). In *Thomas v. Cooper Lighting, Inc.*, the Eleventh Circuit found that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Id*. (internal citations omitted).

---

[3] There is a dispute of fact about the date Plaintiffs were notified of the drug test request.

In this case, Plaintiffs reported the alleged racial discrimination to Daniel Gibson on May 25, 2017. (Doc. 22-1, p. 4). Plaintiffs were allegedly asked to go take a drug test on May 30, 2017. (Doc. 22-6, p. 4). Plaintiffs were notified of their termination on the morning of May 31, 2017. (Doc. 22-1, p. 8) The total length of time from the statutorily protected activity to the adverse employment action was six days. The Eleventh Circuit has held "that a period as much as one month between the protected expression and the adverse action is not too protracted." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citing *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998)).[4] Therefore, six days between the statutorily protected activity and the adverse employment action is an acceptable timeframe to establish a causal connection between the two. Therefore, there is record evidence that, when viewed in the light most favorable to Plaintiffs, establishes a *prima facie* case of retaliation and consequently establishes a presumption of retaliatory intent by Defendant.

## 2.  A Legitimate, Non-discriminatory Reason for the Employment Action

The burden of production now shifts to Defendant to rebut the presumption of retaliation by "articulating a legitimate, non-discriminatory reason for the employment action." *Gogel*, 967 F.3d at 1135. "[T]he employer's burden is merely

---

[4] The *Higdon* Court was analyzing a retaliation claim based on the Americans Disability Act.

one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [retaliated] against the plaintiff.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (*quoting Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

On May 26, 2017, Daniel Gibson, Vice President of the Defendant company, found tourniquets on the ground where the Plaintiffs were standing outside and where their cars were parked. (Doc. 22-1, p. 7). On May 30, 2017, Alvin Gibson called five employees including the three Plaintiffs, Tyler Marshall, and Bryan Irwin, and instructed them to report for drug screening. (*Id.*). Defendant asserts that it terminated Plaintiffs for failure to take the drug tests the same day as the drug test request in violation of the AIC Drug and Alcohol policy. The policy states that "if an employee fails to furnish the appropriate samples 'when requested' they are subject to immediate termination." (Doc. 22-1, p. 8). Plaintiffs note the policy does not specifically require the test to be taken the same day as the request. (Doc. 26, p. 9). When Bone went to take the drug test, he found that he was not in the clinic's system. (Doc. 22-11, p. 19). When Bone discovered this, he called Alvin Gibson for instructions. (*Id.*) Gibson told him not to worry about the test, and that he would call Bone when he had a job for him. (*Id.*). Davis admits that he did not take the drug test

on May 30, 2017, but did take the test the next day. (Doc. 22-6, p. 4). There is a dispute whether Garner took the drug test on May 30, 2017, or May 31, 2017.

This Court need not be persuaded that Plaintiffs were terminated for this reason because Defendant is only required to bear the burden of production, not persuasion. Therefore, the Court finds that Defendant had a legitimate, nondiscriminatory reason for Plaintiffs' termination, i.e. the breach of Defendant's Alcohol and Drug Policy. Thus, the burden shifts back to the Plaintiffs to show Defendant's reason was not the real basis for its action but instead a mere pretext for discrimination. See *Johnson*, 948 F.3d at 1325 (citing *Richardson*, 71 F.3d at 806).

### 3. Pretext

Now that the Defendant has established a legitimate, non-discriminatory reason for Plaintiffs termination, Plaintiffs' presumption of retaliation is eliminated. *See Knox*, 957 F.3d at 1245. The burden now shifts to Plaintiffs to "come forward with evidence allowing a reasonable factfinder to conclude that the proffered reason was pretextual." *Id.* (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)). To determine if the proffered reason from Defendant was pretextual, the Court will look to the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Id*. (citing *Combs*, 106 F.3d at 1538).

As noted, the Defendant claims that it terminated all three Plaintiffs because of their alleged failure to take a drug test on the same day they were told to do so. The Plaintiffs argue that this reason was a pretext for discrimination. The Court notes that there is disputed evidence as to when the Plaintiffs were told to report for drug testing. In his deposition, Davis agrees that his drug test was administered on May 31, 2017. Although he acknowledges prior statements he made indicating that he was told to go for a drug test on May 30, 2017, he goes on to unequivocally clarify that the took the drug test on the same day Gibson told him to go. *See* (Doc. 22-7, p. 87) ("I just hope I ain't got the dates mixed up when Alvin told me because I went on the same day this man told me. I didn't wait. Like as soon as he told me I was on the phone going up there."). As noted, the Defendant has maintained that the men were instructed to take the drug test on May 30, 2017. If a jury were to believe Davis's testimony, it could then conclude that the defendant's reason for terminating the plaintiffs, i.e., that they failed to report for a drug test on the same day they were instructed to go, was a pretext for retaliatory discharge.

This is bolstered by the further fact that Gibson's decision to have the men go for drug testing was made almost immediately after the meeting on May 25, 2017. As noted, it was after that meeting that Gibson allegedly found drug paraphernalia in the parking lot near where the Plaintiffs had been standing. Further, the Plaintiffs point out that the Defendant's drug testing policy does not explicitly say that an

employee must report for testing on the same day he is told to go. All of this evidence, when viewed in the light most favorable to the Plaintiffs, could suggest that the Defendant's stated reason for the Plaintiffs' termination was pretextual. Accordingly, summary judgment is not appropriate as to Count II of the Plaintiffs' complaint and is due to be denied.

## C. Disparate Treatment

In their Response to the Defendant's Motion for Summary Judgment, Plaintiffs allege that their Complaint included a disparate treatment claim of intentional discrimination, and Defendant only addressed the hostile work environment claim. (Doc. 26, pp. 19-20). Plaintiffs argue that Count One of the Complaint contains both a hostile work environment claim and a disparate treatment claim. *Id.* If this were the case, it would constitute impermissible shotgun pleading because two causes of action would be contained in a single count, and hostile work environment and disparate treatment claims have different elements. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (noting a type of "shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief").

This would not put the Defendant on notice for which claims are being brought against it. Further, Plaintiffs failed to provide the Court with any legal analysis on

what constitutes disparate treatment. Therefore, this Court will not analyze this claim at the Summary Judgment stage.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Doc. 22) is **GRANTED** as to the Plaintiffs' hostile work environment claim. However, the motion is **DENIED** as to the remaining claims. Plaintiffs' Hostile Work Environment claim is hereby **DISMISSED WITH PREJEUDICE**. A separate order will be entered contemporaneously with this memorandum opinion.

**DONE** and **ORDERED** this October 8, 2020.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE